

FILED

APR 27 2021

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA

1 William David Bush
  240 West St, Sebastopol
2 California, 95472
3 ((707)829-0941

4

5 UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF CALIFORNIA

6

| WILLIAM D. BUSH | Case No.: |
|---|---|
| Plaintiff Class Advocate | |
| vs. | |
| Defendants | COMPLAINT FOR CONVICTION |
| Sonoma West Holdings Inc Stapleton Acquisition Co. | |
| .... | 5 U.S.C. § 702 (APA), 16 U.S.C. § 1540(g) |

*CV21 3069*

*DMR*

7
8
9
10
11
12
13
14
15
16

17                    **INTRODUCTION**

18      1. Water sustains all life on earth. Our nation's rivers, streams,

19 lakes, and wetlands provide food to eat and water to drink for millions of

20 Americans; serve as habitat for thousands of species of fish and wildlife,

21 including scores of threatened or endangered species; and give the public

22 aesthetic, recreational, commercial, and spiritual benefits too numerous

23 to count. It is for the protection of these waters that congress passed the

    Federal Water Pollution Control Act of 1972, 33 U.S.C. § 1251 et seq.,
24
    commonly known as the Clean Water Act ("CWA" or the "Act").
25
        2. Plaintiff advocates for the protection of oceans, rivers, streams,
26
    lakes, and wetlands, and for the people, animal and plant species that
27
    depend on clean water.
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**JURISDICTION & VENUE**

This Court has jurisdiction over the claims set forth herein pursuant to 5 U.S.C. § 702 (APA), 16 U.S.C. § 1540(g) (ESA citizen suit jurisdiction); Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)1-2 because the site location in conflict resides in this district, and the primary corporate property holder is registered in this district along with its acting agents and employees in these matters.

As required by the ESA's citizen suit provision, 16 U.S.C. § 1540(g)(2)(a)(i), Plaintiffs provided Defendants and the required federal wildlife management agencies with written notice of the ESA violations alleged herein by letter for violation allegation related to the Clean Water Rules. More than 60 days have passed since Plaintiffs provided their notice of intent to enforce.

**PARTIES**

Plaintiff, William D. Bush is a citizen dedicated to protecting and restoring water quality to ensure that the world's waters are drinkable, fishable and swimmable.

Defendant, SonomaWest Holdings Inc is a Corporation in ownership and responsibility of the Sonoma West North Industrial Park facilities located at 1339 Gravenstein Hwy S, Sebastopol, CA 95472 ("Sonoma West").

Defendants, Stapleton Acquisition Company is an entity owned by Craig R. Stapleton, the Companies President and Chief Executive Officer with a mailing address of 4643 S ULSTER STREET, 8TH FLOOR DENVER, CO 80237.

**LEGAL BACKGROUND**

**Overview of the Clean Water Act**

1. In 1972 Congress adopted amendments to the Clean Water Act in an effort "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The 1972 amendments established, among other things, a national goal "of

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

eliminating all discharges of pollutants into navigable waters by 1985" and an "interim goal of water quality which provides for the protection and propagation of fish, shellfish, and wildlife, and provides for recreation in and on the water . . . by 1983." Id. § 1251(a).

2. **CWA § 505**(a) allows citizens to file a civil action against any agency that is alleged to be in violation of an effluent standard or limitation or an order issued by EPA or a State with respect to such standards and limitations

3. CWA section 301(a), 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant by any person, unless such discharge complies with the terms of any applicable permits, and sections 301, 302, 306, 307, 318, 402, and 404 of the Act. 33 U.S.C. § 1311(a). "Discharge of a pollutant" means "any addition of any pollutant to navigable waters from any point source." Id. § 1362(12). "Navigable waters" are broadly defined as "the waters of the United States." Id. § 1362(7).

4. While Congress left the term "waters of the United States" undefined, the accompanying Conference Report indicates that it intended the phrase to "be given the broadest possible constitutional interpretation." S. Rep. No. 92-1236, p.144 (1972).

5. CWA section 402, 33 U.S.C. § 1342, establishes the statutory permitting framework for regulating pollutant discharges under the National Pollutant Discharge Elimination System ("NPDES") program. CWA section 404, 33 U.S.C. § 1344, establishes the permitting framework for regulating the discharge of dredged or fill material into waters of the United States. II. Case Law Interpreting "Waters of the United States"

6. The definition of "waters of the United States" significantly impacts the Agencies' and the States' implementation of the CWA, as it circumscribes which waters are within the Agencies' regulatory authority under the Act, i.e., which waters are jurisdictional. The Act does not protect waters that are not "waters of the United States" from

1  pollution, degradation, or destruction, and it is not unlawful under
2  the Act to dredge and fill them or discharge pollutants into them
3  without a permit.

7. The Agencies last addressed the definition of "waters of the United
4  States" by promulgating essentially identical rules in the mid-1970s.
5  Those regulations asserted jurisdiction over traditionally navigable
6  waters, non-navigable tributaries to those (and other) waters,
7  wetlands adjacent to other jurisdictional waters, and any "other
8  waters," the use, degradation, or destruction of which could affect
9  interstate or foreign commerce. See, e.g., 33 C.F.R. § 328.3(a)(1), (5),
10  (7), and (3) (2014), respectively.

8. The Clean Water Rule is the Agencies' most recent attempt to define
11  "waters of the United States." The impact of the Rule is sweeping; it
12  will result in a massive net loss of CWA jurisdiction as compared to
13  the Agencies' historic interpretation of the Act under their prior rule.
14

9. The Agencies' efforts were undertaken against the backdrop of three
15  Supreme Court cases addressing this statutory phrase. See United
16  States v. Riverside Bayview Homes, Inc., 474 U.S. 121 (1985); Solid
17  Waste Agency of Northern Cook County v. United States Army Corps
18  of Engineers, 531 U.S. 159 (2001) ("SWANCC"); and Rapanos v.
19  United States, 547 U.S. 715 (2006). 35. In Riverside Bayview, the
20  Court upheld the Corps' broad interpretation of the phrase "water of
21  the United States" to include wetlands adjacent to traditionally
22  navigable waters. 474 U.S. at 139. 36. In SWANCC, the Court rejected
23  the Corps' assertion of CWA jurisdiction over isolated intrastate
24  waters where the sole asserted basis for jurisdiction was the use of
25  the relevant waters by migratory birds under the Migratory Bird Rule,
26  51 Fed. Reg. 41217 (1986). See 531 U.S. at 163–64. 37. In Rapanos, a
27  divided Court announced widely divergent standards for determining
28  CWA Act jurisdiction over wetlands adjacent to non-navigable
tributaries. Justice Scalia, writing for the four-justice plurality, held

1  that the Corps could not categorically assert jurisdiction over all
2  wetlands adjacent to ditches or man-made drains that discharge into
3  traditional navigable waters. 547 U.S. at 725, 757 (Scalia, J.) In his
4  concurring opinion, Justice Kennedy indicated that only those waters
5  possessing "a significant nexus with navigable waters" are subject to
6  CWA jurisdiction. Id. at 759. He further explained that wetlands
7  possess the requisite nexus, and thus come within the statutory
8  phrase 'navigable waters,' if the wetlands, either alone or in
9  combination with similarly situated lands in the region, significantly
10 affect the chemical, physical, and biological integrity of other covered
11 waters more readily understood as 'navigable.' Id. at 780. Justice
12 Kennedy also recognized that the Agencies had authority under the
13 Act to "identify categories of tributaries that, due to their volume or
14 flow, . . . their proximity to navigable waters, or other relevant
15 considerations, are significant enough that wetlands adjacent to them
16 are likely, in the majority of cases, to perform important functions for
17 an aquatic system incorporating navigable waters." Id. at 781. 38.
18 Writing for the four dissenters in Rapanos, just as he had done in
19 SWANCC, Justice Stevens recognized the "comprehensive nature" of
20 the CWA as well as "Congress' deliberate acquiescence" to the
21 Agencies' long-standing definition of "waters of the United States,"
22 and thus would have deferred to that definition and the Corps'
23 assertion of jurisdiction over the wetlands and ditches at issue in the
24 case. 547 U.S. at 797, 803. Justice Breyer joined the dissenting
25 opinion by Justice Stevens, but also wrote separately to emphasize
26 that "the authority of the Army Corps of Engineers under the CWA
27 extends to the limits of congressional power to regulate interstate
28 commerce." 547 U.S. at 811. 39. As Justice Stevens noted in his
   Rapanos dissent, Given that all four Justices who have joined this
   opinion would uphold the Corps' jurisdiction in both of these cases—
   and in all other cases in which either the plurality's or Justice

1  Kennedy's test is satisfied—on remand each of the judgments should

2  be reinstated if either of those tests is met. 547 U.S. at 810. Thus,

3  every federal court of appeals to consider the scope of CWA

4  jurisdiction following Rapanos has held that a water is jurisdictional

   at least whenever Justice Kennedy's "significant nexus" test is

5  satisfied.  No Circuit has held that the Justice Scalia's approach is the

6  exclusive method for establishing CWA jurisdiction.

7  10. Furthermore, California enacted The **Dickey Act** in **1949**: and

8  created a "State **Water Pollution** Control Board" consisting of nine

9  gubernatorial appointees representing specific interests and four ex

   officio state officials. The **Dickey Act** established nine regional **water**

10 **pollution** control boards in each of the major California watersheds.

11 By which:

12 1. **DIVISION 7. WATER QUALITY [13000 - 16104] CHAPTER 2.**

13 **Definitions [13050 - 13051]**

14
   (k) "Contamination" means an impairment of the quality of the waters

15 of the state by waste to a degree which creates a hazard to the

16 public health through poisoning or through the spread of disease.

17 "Contamination" includes any equivalent effect resulting from the

18 disposal of waste, whether or not waters of the state are affected.

19 (l) "Pollution" means an alteration of the quality of the waters of the

20 state by waste to a degree which unreasonably affects either of the

21 following:

22 (A) The waters for beneficial uses.

23 (B) Facilities which serve these beneficial uses.

24 "Pollution" may include "contamination."

25 (m)"Nuisance" means anything which meets all of the following

26 requirements:

27

28

(1) Is injurious to health, or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property.

(2) Affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals may be unequal.

(3) Occurs during, or as a result of, the treatment or disposal of wastes.

(n) "Recycled water" means water which, as a result of treatment of waste, is suitable for a direct beneficial use or a controlled use that would not otherwise occur and is therefor considered a valuable resource.

(o) "Citizen or domiciliary" of the state includes a foreign corporation having substantial business contacts in the state or which is subject to service of process in this state.

(p) (1) "Hazardous substance" means either of the following:

(A) For discharge to surface waters, any substance determined to be a hazardous substance pursuant to Section 311(b)(2) of the Federal Water Pollution Control Act (33 U.S.C. Sec. 1251 et seq.).

(B) For discharge to groundwater, any substance listed as a hazardous waste or hazardous material pursuant to Section 25140 of the Health and Safety Code, without regard to whether the substance is intended to be used, reused, or discarded, except that "hazardous substance" does not include any substance excluded from Section 311(b)(2) of the Federal Water Pollution Control Act because it is within the scope of Section 311(a)(1) of that act.

(2) "Hazardous substance" does not include any of the following:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

(A) Nontoxic, nonflammable, and noncorrosive stormwater runoff drained from underground vaults, chambers, or manholes into gutters or storm sewers.

(B) Any pesticide which is applied for agricultural purposes or is applied in accordance with a cooperative agreement authorized by Section 116180 of the Health and Safety Code, and is not discharged accidentally or for purposes of disposal, the application of which is in compliance with all applicable state and federal laws and regulations.

(C) Any discharge to surface water of a quantity less than a reportable quantity as determined by regulations issued pursuant to Section 311(b)(4) of the Federal Water Pollution Control Act.

(D) Any discharge to land which results, or probably will result, in a discharge to groundwater if the amount of the discharge to land is less than a reportable quantity, as determined by regulations adopted pursuant to Section 13271, for substances listed as hazardous pursuant to Section 25140 of the Health and Safety Code. No discharge shall be deemed a discharge of a reportable quantity until regulations set a reportable quantity for the substance discharged.

(q) (1) "Mining waste" means all solid, semisolid, and liquid waste materials from the extraction, beneficiation, and processing of ores and minerals. Mining waste includes, but is not limited to, soil, waste rock, and overburden, as defined in Section 2732 of the Public Resources Code, and tailings, slag, and other processed waste materials, including cementitious materials that are managed at the cement manufacturing facility where the materials were generated.

(2) For the purposes of this subdivision, "cementitious material" means cement, cement kiln dust, clinker, and clinker dust.

(r) "Master recycling permit" means a permit issued to a supplier or a distributor, or both, of recycled water, that includes waste discharge requirements prescribed pursuant to Section 13263 and water recycling requirements prescribed pursuant to Section 13523.1.

**GENERAL FACTUAL ALLEGATIONS**

11. Sonoma West Holdings is owned by Craig R. Stapleton of Stapleton Acquisition Company; and this Industrial Complex sits on the Northern border of the township of Sebastopol, directly atop the Russian River Watershed, a protected wetland and watershed for the Russian River- prior precedented as Waters of the United States covered by the CWA.

12. Sonoma West leases a complex of industrial use facilities to a number of private businesses.

13. The property contains a sizable industrial waste water treatment facility owned and operated through management by Sonoma West Holdings Inc.

14. Sonoma West has had an excessive quantity of violations noted on their permit records with the regional California Water Board.

15. Prior to November 2018, when the plaintiff initiated his CWA investigation, Sonoma West's Water Treatment Facilities were being solo operated by Michael Babbini, an employee of Sonoma West Holdings;

16. Mr. Babbini does not hold the rquired industrial Waste Water Treatement facility ceritfications to be the facility operator of the waste water treatment pond located at Sonoma West (North.)

17. The Plaintiff has rcorded significant environmental damage around the Waste Water Treatment facility site location- including many

empty barrels of hazardous chemicals seemingly being dumped and left on site with caution tape rapped around them.

18. The Plaintiff contacted Mr. Babbini in his Trailer office to report the toxic labelled barrels and environmental damage in the area, and to seek further information on the Waste Treatment facility.

19. Mr Babbini was immediately hostle and dismissive to the Plaintiff, telling him he didn't have to answer questions to anyone but the Regional California State "Water Board people."

20. Mr Babbini yelled at the plainitiff to get out of his office, or he would call the sheriff. The plaintiff proceeded to leave, but questioned Mr Babbini further on his way out for information on what was going on with the treatment Pond. Mr Babbini explained that it was an industrial waste treatment pond..

21. The Plaintiff, exited the Trailer noticing all of the flasks, beakers, and assortment of chemistry equipment that was inside the Trailer Office at Sonoma West (North.)

22. Days later, the Plaintiff was approached at his home by a Sonoma County Sheriffs officer; unbenounced at that time. Mr Babbini had claimed that the Plaintiff had physically assaulted him.  The Plaintiff explained to the Sheriff his legitimate reason for being at Sonoma West as related to the noticable environmental damages surrounding the site location. The Sheriff took the report; (see video recording as evidence.)

23. A month later the Plaintiff received a summons delivered by 5 Sheriffs Officers at his door for a restraining order hearing. Mr Babbini had hired a strategically connected lawfirm to seek a criminal charges against the plaintiff, lead by a civil restraining order upon the Plaintiff investigating the environmental damages and clean water issues legally under 5 U.S.C. § 702 (APA), 16 U.S.C. § 1540(g) (ESA citizen suit jurisdiction.)

24. The Plaintiff had no intention of contacting Mr Babbini again having already taken samples and many photos as evidence of the environmental damage and toxic chemical trash on-site at Sonoma West's treatment ponds.

25. The Plaintiff did not oppose the Defendants restraining order.

26. Roughly 3 months after the incident a Warrant issued by the Sonoma County District Attorney's Office for Trespassing, and Assault charges against the Plaintiff involving Mr Babbini and Sonoma West.

27. Roughly 8 months later the Plaintiff was arrested by the Sebastopol Police department while doing pull ups at the local park on the warrant which had been previously issued.

28. The Plaintiff upon receiving the information from the District Attorney and reading the Defendants accusations, scheduled a formal settlement conference with Deputies from the District Attorneys office. Representing the People was Deputy DA, Aaron Frisbie.

29. The Plaintiff cross examined to the Deputy the story that Mr. Babbini claimed, without any evidence to support his story, was physically impossible. The Plaintiff demonstrated to the Deputy the dynamics and the location of injury Mr. Babbini had claimed under sworn oath testimony and sworn written statement was caused by the Plaintiff, were in fact, not in anyway, physically possible given the scene and scenario.  Further explaining my legitimate reason for being there, that fact that the property is open to the public, and Mr Babbini's hostility towards the Plaintiff, offering the DA reasonable motive for Mr. Babbini to lie in a successful attempt to manipulate authorities to intimidate the Plaintiff to drop his CWA investigations and do the plaintiff harm.

30. The Deputy D.A. after conferring with his superiors, dropped all charges against the Plaintiff.

31. The Plaintiff filed a wrongful arrest complaint against Mr. Babbini, Sonoma West, and their Lawyer responsible for manipulating the

1   District Attorneys Office to file charges against the Plaintiff without
2   any evidence to merit such while conspiring perjury.

3   32. The Sonoma West (North) property contains creeks and other man
4   made waterways that are polluting U.S. Waterways; many violations of
    the permitted releases have been sited by the California Waterboard,
5   see attached violations within the past 5 years. No diciplinary actions
6   have been taken by the regional water regulation agencies.

7   33. Additional photographic evidence, and testimony submitted by the
8   Plaintiff would indicate illegal chemical dumping is occurring outside
9   the treatment facilities testing sites and facilities, specifically along
10  the treated waste water release trench canals by-passing the regular
11  inspections.

12  34. The majority of environmental damage alleged by the plaintiff to this
13  complaint, is showcased in the surrounding areas is outside the
14  property of Sonoma West, and beyond the testing site location.

15  35. The plaintiff has been in contact with the California Department of
16  Toxic substances, referred by the EPA, the Plaintiff spoke with agent
    George Baker; the Plaintiff showcased the photographic evidence
17  requesting direction on what to do. Agent Baker immediately
18  recognised the photos as serious environmental damage and
19  instructed the Plaintiff to contract the local District Attorney for
20  Environmental Crime.

21  36. The Plaintiff followed up, contacting Mrs. Ann Gallagher-White with
22  the Sonoma County District Attorney's Office. Explaining the
23  situation, and what Agent Baker had directed him to do. Mrs.
24  Gallagher-White instructed the Plaintiff to seek the Department of
25  Fish and Wildlife to get the testing and evidence she required for her
26  office to proceed with any formal criminal proceeding.

27  37. The Plaintiff contacted the local Fish and Wildlife Warden, Tiffany
28  Wolvek, explaining the situation, scheduling a time to meet on site for
    review. As instructed I requested that a Warden and Biologist needed

to be present for official xourt use evidence testing. The week of our appointment, Mrs. Wolvek was required to reschedule for an emergency reason unknown at this time.  The day of our rescheduled site location review a week later, Tiffany explained that her supervisor had spoken with one of the site location managers, and decided that there was no issue that they would be reviewing or taking samples for testing.

38. The Plaintiff asked to speak with her supervisor, and was directed to Ltn. James "Jim" Jones, who claimed after speaking with the site location operators, and he had determined, remotely by phone, that there was no violations and no testing was needed;  Stonewalling the requests from the Toxic Substances department agency and the local district attorney's office.

39. **Plaintiff is requesting this Court for an order directing the official federal government agencies in charge of toxic substances testing as related to the Clean Water Act to conduct such at the Sonoma West Holdings Site location(s).**

40. The Plaintiff alleges the defendants waste water treatment operations are causing serious environmental damage with the cited violation discharges, and toxic cleaning agent container dumping pollutants into water systems protected under The Clean Water Act 33 U.S.C. § 1251.  The Plaintiff has directly obversed, and taken photographic evidence from the disposal of, and resulting environmental damage effects from the disposal of toxic substances at the Sonoma West property.

41. The Plaintiff alleges that the Sonoma West waste treatment facility operator from the time period of 03/21/2006 up until 11/29/2018 was Michael Babbini as documented by the California intergrated Water Quality System, an employee of Sonoma West; Mr Babbini does not hold the required industrial waste treatment facility certifications to be responsible for operating the industrial waste pond facilities at

1    Sonoma West. Putting the Defendant(s) in violation of, and liable to,

2    the Clean Water act provisions over the violation time period.

42. "Waters of the United States," which include wetlands, rivers,

3    streams, lakes, ponds and the territorial seas, provide many functions

4    and services critical for our nation's economic and environmental

5    health. In addition to providing habitat, rivers, lakes, ponds and

6    wetlands cleanse our drinking water, ameliorate storm surges, provide

7    invaluable storage capacity for some flood waters, and enhance our

8    quality of life by providing myriad recreational opportunities, as well

9    as important water supply benefits. 79 Fed. Reg. at 22,191.

10   43. Many types of waters are connected in a hydrologic cycle, and a key

11   purpose of the CWA is to ensure protections for waters that may not

12   themselves be navigable in fact, but which affect such waters. As

13   EPA's own Office of Research and Development has summarized

14   a) "The scientific literature unequivocally demonstrates that streams,

     individually or cumulatively, exert a strong influence on the

15   integrity of downstream waters. All tributary streams, including

16   perennial, intermittent, and ephemeral streams, are physically,

17   chemically, and biologically connected to downstream rivers via

18   channels and associated alluvial deposits where water and other

19   materials are concentrated, mixed, transformed, and transported."

20   b) "The literature clearly shows that wetlands and open waters in

21   riparian areas and floodplains are physically, chemically, and

22   biologically integrated with rivers via functions that improve

23   downstream water quality, including the temporary storage and

24   deposition of channel-forming sediment and woody debris,

25   temporary storage of local ground water that supports baseflow in

26   rivers, and transformation and transport of stored organic matter."

27   c) Wetlands and open waters in non-floodplain landscape settings

     (hereafter called "non-floodplain wetlands") provide numerous

28   functions that benefit downstream water integrity. These functions

include storage of floodwater; recharge of ground water that sustains river baseflow; retention and transformation of nutrients, metals, and pesticides; export of organisms or reproductive propagules to downstream waters; and habitats needed for stream species. This diverse group of wetlands (e.g., many prairie potholes, vernal pools, playa lakes) can be connected to downstream waters through surface-water, shallow subsurface-water, and ground-water flows and through biological and chemical connections."

In addition, EPA's own Scientific Advisory Board (SAB) has concluded that "groundwater connections, particularly via shallow flow paths in unconfined aquifers, can be critical in supporting the hydrology and biogeochemical functions of wetlands and other waters. **Groundwater also can connect waters and wetlands that have no visible surface connections.**"

### The Clean Water Rule

On April 21, 2014, the Agencies published in the Federal Register a proposed rule entitled Definition of 'Waters of the United States' Under the Clean Water Act ("Proposed Clean Water Rule"). 79 Fed. Reg. 21,188–22,274 (Apr. 21, 2014).

The Clean Water Rule effectively placed all of the nation's waters into one of three categories for purposes of CWA jurisdiction:

(1) Waters that are per se jurisdictional, including traditional navigable waters; interstate waters; the territorial seas; tributaries (as defined elsewhere in the rule) of traditional navigable waters, interstate waters, and territorial seas; impoundments of other jurisdictional waters; and all waters that are adjacent to (as defined elsewhere in the rule) the waters described above;

(2) Waters that are per se non-jurisdictional, including (among others) waters converted to waste treatment systems; certain types of ditches; ephemeral features that do not meet the definition of a tributary; groundwater; and waters outside the 100-year floodplain and more than 4,000 feet of the high tide line or ordinary high water mark of a traditional navigable water, interstate water, the territorial seas, impoundment of other jurisdictional waters, or tributary; and

(3) Waters which will be assessed for jurisdiction on a case-specific basis by applying a significant nexus analysis, including (among others) all adjacent waters being used for established normal farming, ranching, and silviculture activities; all of certain categories of waters, including prairie potholes, pocosins, and western vernal pools; all waters within the 100- year floodplain of a traditional navigable water, interstate waters, or the territorial seas; and all waters located within 4,000 feet of the high tide line or ordinary high water mark of a traditional navigable water, interstate water, the territorial seas, impoundment of other jurisdictional waters, or tributary.

On July 13, 2015, the Clean Water Rule became a "final agency action" within the meaning of 5 U.S.C. § 704

**Tributaries under the Final Clean Water Rules**

The Clean Water Rule defines "tributary" as "a water that contributes flow, either directly or through another water" to a traditional navigable water, interstate water, or territorial seas, and "that is characterized by the presence of the physical indicators of a bed and banks and an ordinary high water mark." 80 Fed. Reg. at 37,105; 33 C.F.R. § 328.3(c)(3). As the Agencies explain in the preamble to the Clean Water Rule, this definition "requires the presence of a bed and banks and an additional indicator of ordinary high water mark such as staining,

1 debris deposits, or other indicator." 80 Fed. Reg. at 37,076 (emphasis

2 added).

3 **Limits on the Application of the Significant Nexus Test under the Proposed and Final Clean Water Rules**

4 In the final Clean Water Rule, the Agencies defined waters of the United

5 States to include "all waters located within 4,000 feet of the high tide line

6 or ordinary high water mark of" a per se jurisdictional water (other than

7 adjacent waters), "where they are determined on a case-specific basis to

8 have a significant nexus" with such water. 80 Fed. Reg. at 37,114. 93.

9 Under the Clean Water Rule, most waters located more than 4,000 feet of

10 the high tide line or ordinary high water mark of a per se jurisdictional

11 water other than an adjacent water (hereinafter collectively referred to as

12 "qualifying per se jurisdictional waters") are automatically excluded from

13 CWA jurisdiction, even if those waters have or may possess a significant

14 nexus with the jurisdictional water or otherwise have a significant affect

15 on interstate commerce.9 See 80 Fed. Reg. at 37,086 (describing the

16 "exclusive" and "narrowly targeted circumstances" under which case-

17 specific significant nexus determinations can be made under the Clean

18 Water Rule).

18 The Proposed Clean Water Rule did not include the 4,000-foot

19 limitation—or any other distance limitation—on the application of the

20 significant nexus test to other waters. Instead, the Proposed Rule would

21 have extended CWA jurisdiction to all "other waters, including wetlands,

22 provided that those waters alone, or in combination with other similarly

23 situated waters, including wetlands, located in the same region, have a

24 significant nexus to" traditional navigable waters, interstate waters, and

25 the territorial seas. 79 Fed. Reg. at 22,268. For example, under the

26 Proposed Rule, a wetland complex located 5,000 feet from a qualifying per

27 se jurisdictional water could be subject to CWA jurisdiction if it was shown

28 to possess a significant nexus with a traditional navigable water, an

interstate water, or a territorial sea.

**Adjacent Waters and Normal Farming Activities under the
Proposed and Final Clean Water Rules**

Prior to the Clean Water Rule, the Agencies considered all wetlands adjacent to a traditional navigable water to have a "significant nexus" to that water, in recognition of the fact that waters and their adjacent wetlands are properly viewed as one system due to their hydrological connection with one another. Thus, prior to the Proposed or Final Clean Water Rule, the Agencies considered all adjacent wetlands to be jurisdictional under the CWA.

Under both the Proposed and the Final Clean Water Rule, "waters of the United States" include all waters that are "adjacent" to a traditional navigable water, interstate water, territorial sea, impoundment of a jurisdictional water, or tributary. See 79 Fed. Reg. at 22,206-07; 80 Fed. Reg. at 37,058.

In the Proposed Clean Water Rule the Agencies proposed to define "adjacent" as follows: The term adjacent means bordering, contiguous or neighboring. Waters, including wetlands, separated from other waters of the United States by man-made dikes or barriers, natural river berms, beach dunes and the like are "adjacent waters." 79 Fed. Reg. at 22,270 (citing proposed 40 C.F.R. § 232.2).

In the preamble to the Proposed Clean Water Rule, the Agencies stated that the rule "does not affect any of the exemptions from CWA section 404 permitting requirements provided by CWA section 404(f), including those for normal farming, silviculture, and ranching activities." 79 Fed. Reg. at 22,199 (citing 33 U.S.C. § 1344(f); 40 CFR 232.3; 33 CFR 323.4).

**Groundwater under the Proposed and Final Clean Water Rule**

The Agencies have a longstanding and consistent interpretation that the CWA may cover discharges to groundwater that has a direct hydrological connection to surface waters. See, e.g., National Pollutant

1 Discharge Elimination System Permit Application Regulations for Storm
2 Water Discharges, 55 Fed. Reg. 47990-01 (Nov. 16, 1990). This
3 interpretation has been upheld by numerous courts. See, e.g., Friends of
  Santa Fe Cnty. v. LAC Minerals, Inc., 892 F. Supp. 1333, 1357-58 (D.N.M.
4 1995); Washington Wilderness Coalition v. Hecla Mining Co., 870 F.Supp.
5 983, 990 (E.D. Wash.1994); Sierra Club v. Colo. Ref. Co., 838 F.Supp.
6 1428, 1433–34 (D. Colo. 1993); McClellan Ecological Seepage Situation v.
7 Weinberger, 707 F.Supp. 1182, 1195–96 (E.D. Cal.1988), vacated on other
8 grounds, 47 F.3d 325 (9th Cir.1995), cert. denied, 516 U.S. 807, 116 S.Ct.
9 51, 133 L.Ed.2d 16 (1995); New York v. United States, 620 F.Supp. 374,
10 381 (E.D.N.Y.1985).

11      The Agencies proposed definition of "waters of the United States"
12 excluded all "groundwater, including groundwater drained through
13 subsurface drainage systems." 79 Fed. Reg. at 22,193. In the preamble to
14 the Proposed Clean Water Rule, EPA explained that the reasoning behind
   this exclusion was that the agencies had never interpreted "waters of the
15 United States" to include groundwater. Id. at 22,218.

16      In April of 2020, the U.S. Supreme Court weighed in on the subject
17 matter with opinion declaring: ""The Clean Water Act forbids the "addition"
18 of any pollutant from a "point source" to "navigable waters" without the
19 appropriate permit from the Environmental Protection Agency (EPA).
20 Federal Water Pollution Control Act, §§301(a), 502(12)(A), as amended by
21 the Federal Water Pollution Control Act Amendments of 1972 (Clean Water
22 Act) §2, 86 Stat. 844, 886, 33 U. S. C. §§1311(a), 1362(12)(A). The question
23 presented here is whether the Act "requires a permit when pollutants
24 originate from a point source but are conveyed to navigable waters by a
25 nonpoint source," here, "groundwater." .. We conclude that the statutory
26 provisions at issue require a permit if the addition of the pollutants
   through groundwater is the functional equivalent of a direct discharge
27 from the point source into navigable waters."
28

1    The SAB provided comments on the proposed definition and
2  specifically noted that there was no scientific justification for the
3  groundwater exclusion. See Letter from Dr. David T. Allen, supra note 3, at
4  3. The SAB went on to comment: "The available science . . . shows that
   groundwater connections, particularly via shallow flow paths in
5  unconfined aquifers, can be critical in supporting the hydrology and
6  biogeochemical functions of wetlands and other waters. Groundwater also
7  can connect waters and wetlands that have no visible surface
8  connections."
9    At instant we have a wetland tributary of the Russian River Water
10 shed, by which waters flow through creeks, streams and wetlands
11 traversing through the landscape carrying any pollutant, weather it be a
12 pesticide, herbicide, or any other toxic chemical into the navigable waters
13 of the Russian river; damaging the ecological balance and stability of the
14 entire environmental life system.  And in such case, as is here, the Plaintiff
15 asserts Brown Farm is in violation of the Federal Water Pollution Control
   Act. Additionally for any water related environmental activities to continue
16 Federal permitting should be required.
17    **Waste Treatment Systems under the Proposed and Final Clean**
18                    **Water Rule.**
19    On May 19, 1980, EPA promulgated a rule establishing the
20 requirements for several environmental permitting programs, including the
21 NPDES program. See 45 Fed. Reg. 33,290 (May 19, 1980). As part of this
22 action, EPA promulgated a definition of the term "waters of the United
23 States." That rule stated that: Waste treatment systems, including
24 treatment ponds or lagoons designed to meet the requirements of the CWA
25 (other than cooling ponds as defined in 40 C.F.R. § 423.11(m) which also
26 meet the criteria of this definition) are not waters of the United States. This
27 exclusion applies only to manmade bodies of water which neither were
28 originally created in waters of the United States (such as disposal area in

1 wetlands) nor resulted from the impoundment of waters of the United

2 States.

3        45 Fed. Reg. 33,290, 33,424 (emphasis added); see also 40 C.F.R. §

4 122.3 (1980). The preamble to this 1980 rule explains that the second

5 sentence of this regulation was included "because CWA was not intended

6 to license dischargers to freely use waters of the United States as waste

treatment systems." 45 Fed. Reg. 33,290, 33,298.

7        Two months later EPA suspended the second sentence of this

8 regulation (italicized above) by removing it from the regulation entirely. In

9 its place, EPA inserted a footnote stating that the sentence was

10 "suspended until further notice." 45 Fed. Reg. 48,620 (July 21, 1980). EPA

11 explained in a Federal Register notice that it was suspending this sentence

12 due to industry's objections that the regulation "would require them to

13 obtain permits for discharges into existing waste water treatment systems,

14 such as power plant ash ponds, which had been in existence for many

15 years." Id.

16        EPA did not provide the public with an opportunity to comment on

17 the suspension at the time the action was taken in 1980. Instead, EPA

18 noted its intent to "promptly develop a revised definition and to publish it

19 as a proposed rule for public comment. At the conclusion of that rule-

20 making, EPA will amend the rule, or terminate the suspension." Id.

21        EPA never developed a revised definition, and thus never

22 submitted a proposed rule regarding this limitation on the waste treatment

23 system exclusion for notice and comment. The public has therefore never

24 had the opportunity to comment on or legally challenge the suspension of

the sentence.

25        Due to the "suspension" of the second sentence of the waste

26 treatment system exclusion found at 40 C.F.R. § 122.3 in 1980,

27 subsequently promulgated regulatory definitions of "waters of the United

28 States" did not include that sentence. As such, this suspension—and the

Agencies' obligation to take action to resolve it— has seemingly been

1 forgotten, as the Agencies continue to promulgate definitions of "waters of

2 the United States" that do not, because of the ongoing suspension, contain

3 this limitation on the exclusion for waste treatment systems.

4      The Proposed Clean Water Rule included the "suspended" second

5 sentence of the waste treatment system exclusion, but noted in a footnote

6 that the suspension was still in effect. See 79 Fed. Reg. at 22,268. In

7 addition, in the preamble to the Proposed Clean Water Rule the Agencies

8 purport to make only "ministerial" changes to the waste treatment system

9 exclusion, and thus stated that were not seeking comment on this

10 exclusion. Id. at 22,190, 22,217. However, these "ministerial" changes

    included the addition of a comma not in the existing exclusion.

11      The definition of "waters of the United States" in 40 C.F.R. § 122.2,

12 as revised by the Clean Water Rule, provides that "the following are not

13 'waters of the United States' even where they otherwise meet the terms of

14 (1)(iv) through (viii) of the definition" [i.e., even if they are otherwise

15 jurisdictional as impoundments, tributaries, adjacent waters, or waters

16 with a significant nexus to traditional navigable waters, interstate waters,

17 or the territorial seas]: Waste treatment systems, including treatment

18 ponds or lagoons designed to meet the requirements of the Clean Water

19 Act. This exclusion applies only to manmade bodies of water which neither

20 were originally created in waters of the United States (such as disposal

21 area in wetlands) nor resulted from the impoundment of waters of the

22 United States. [See Note 1 of this section.] 80 Fed. Reg. at 37,114. As it did

23 before, "Note 1" of the revised 40 C.F.R. § 122.2 purports to continue the

    suspension of the last sentence of the waste treatment system exclusion.

24      In the Clean Water Rule, the Agencies lifted the suspension of the

25 last sentence in 40 C.F.R. § 122.2's exclusion for waste treatment system,

26 and then reinstated the suspension. See 80 Fed. Reg. at 37,114. The

27 preamble to the Clean Water Rule describes the changes to the waste

    treatment system exclusion as "ministerial" and notes that "because the

28 agencies are not making any substantive changes to the waste treatment

1  system exclusion, the final rule does not reflect changes suggested in
2  public comments." Id. at 37,097.

3      However, the Agencies note in the preamble to the Clean Water
4  Rule that they did, in fact, respond to comments that the addition of the
   comma narrowed the exclusion, by removing the comma. 80 Fed. Reg. at
5  37,114. Thus, the agencies responded to some substantive comments on
6  the scope of the exclusion, but not others. Several plaintiffs submitted
7  comments on the Proposed Clean Water Rule that were not addressed by
8  the Agencies. And, moreover, in responding to some of the comments, the
9  Agencies adopted a broader exclusion (e.g., excluding more waste
10 treatment systems) than had been contemplated by the Proposed Rule.

11     The Clean Water Rule does not define "waste treatment systems."
12 Thus, under the waste treatment system exclusion in the Final Rule
13 (including the ongoing suspension of the last sentence of that exclusion),
14 certain types of waters such as adjacent wetlands, ponds, or tributaries
   are not subject to CWA jurisdiction if they are deemed to be part of a
15 "waste treatment system"— even if they are themselves naturally occurring
16 waters, were created entirely within a naturally occurring water, or were
17 created by impounding another water of the United States. For example,
18 under the Clean Water Rule an industrial facility could unilaterally destroy
19 CWA jurisdiction over a naturally occurring wetland or tributary merely by
20 using that wetland or tributary as part of its on-site "waste treatment
21 system." This exemption is contrary to the fundamental purposes of the
22 CWA and flies in the face of any permissible reading of "waters of the
23 United States." See 33 U.S.C. § 1251(a).

24     In the Preamble to the Clean Water Rule, the Agencies
25 unambiguously recognize that adjacent waters, tributaries, and
26 impoundments are jurisdictional by rule because "the science confirms
   that they have a significant nexus to traditional navigable waters,
27 interstate waters, or territorial seas." 80 Fed. Reg. at 37,058, 37,075.
28 Thus, the Agencies construe the Clean Water Rule as making these waters

1 jurisdictional "in all cases" and suggest that "no additional analysis is

2 required" to assert CWA jurisdiction over them. Id. at 37,058. These

3 statements, however, are flatly contradicted by the waste treatment system

exclusion, which excludes adjacent waters, tributaries, and

4 impoundments of jurisdictional waters (among others) that are deemed to

5 be part of a "waste treatment system."

6

7                                   **Jury Demand**

8 Plaintiff hereby demands a jury trial in this action.

9                                 **Request for Relief**

10 Plaintiff respectfully requests that the Defendants be cited to appear and

11 answer this complaint herein; that a judgement be entered against the

12 Defendants for an amount to be determined based on the statutory

13 penalties as applicable, and that the environmental damages caused by

14 the Defendants be awarded in a corresponding monetary amount to the

Environmental Protection Agency (EPA) for the purpose of further

15 protection and clean up as applicable to the purpose and intent of the

16 Federal Clean Water Act.

17 The Plaintiff further requests that the Defendants be held accountable by

18 this court for the damages caused by the defendants to the plaintiff in an

19 amount this Court sees justified and fit.

20

21 Dated: April 26th, 2021

22

23 _____

24                                   William David Bush

25                                   Advocating Plaintiff

26

27

28